624 P.2d 309

**STATE of Arizona, Appellee,**

v.

**R. Wayne MILLER, Appellant.**

**1 CA–CR 3927.**

Court of Appeals of Arizona, Division 1, Department A.

Nov. 4, 1980.

Rehearing Denied Feb. 5, 1981.

Review Denied Feb. 24, 1981.

Robert K. Corbin, Atty. Gen. by William J. Schafer, III, Chief Counsel, Criminal Division, Robert S. Golden, Asst. Attys. Gen., Phoenix, for appellee.

Erlichman, Fagerberg & Chase by Joseph Erlichman, Kenneth Chase, Phoenix, for appellant.

OPINION

FROEB, Presiding Judge.

Appellant was convicted of grand theft by false pretenses in violation of former A.R.S. §§ 13-661, -663, and -671 and two counts of perjury in violation of A.R.S. §§ 13-561 and -572, following a trial by jury. He was sentenced to serve not less than nine nor more than ten years in the Arizona State Prison on each count, the sentences to run concurrently. He raises five issues for our consideration on appeal: 1) Whether the trial court erred in admitting testimony regarding a prior bad act involving James Jeffries; 2) whether the trial court erred in allowing a superior court judge to testify and give his opinion of appellant's credibility; 3) whether the trial court erred in denying his motion for mistrial based upon questioning of a prosecution witness; 4) whether the trial court erred in denying two of appellant's requested jury instructions; 5) whether the trial court erred in denying appellant's motion to quash the State's subpoena duces tecum for records held by appellant's law clerk.

In the fall of 1976, appellant was a practicing attorney in Maricopa County. His advice regarding a divorce was sought by Gerald Klungtvedt on September 1, 1976. Klungtvedt paid appellant a $200.00 retainer and gave appellant information concerning his finances. The following day, Klungtvedt informed appellant he had changed his mind about the divorce proceedings and instead desired appellant to prepare a will for him. Appellant told Klungtvedt that the charge for the will would be $100.00 and that the $100.00 remaining from the retainer would be returned to Klungtvedt. The will was prepared, and on November 17, 1976, Klungtvedt went to appellant's office to pick up the remaining $100.00. At that time appellant told Klungtvedt that he (appellant) had an opportunity to make $250,-000.00 on a land deal in Fricot City, California, but that he needed $50,000.00 immediately to clear up some deeds of trust in connection with the land transaction. Appellant asked Klungtvedt whether he would

be interested in making a loan to appellant of $50,000.00 and Klungvedt stated that he was too conservative to loan such a sum. Klungtvedt also told appellant that he would be willing to assist appellant in procuring a bank loan for the money. Appellant told Klungtvedt that the money was needed immediately and that there was no time to obtain a bank loan and offered Klungtvedt a bonus of $5,000.00 to $10,-000.00 if he loaned the money until December 1. Klungtvedt again indicated that he was not interested in making the loan.

The following day, appellant called Klungtvedt and they agreed to meet at appellant's office to discuss the loan again. At that time, appellant offered Klungtvedt a $15,000.00 bonus and Klungtvedt stated that he might be interested and he would like to talk to the title officer in California to determine whether the land transaction was proceeding to closing. Klungtvedt telephoned Jack Adams from Safeco Title Insurance Company in California, and Mr. Adams told Klungtvedt that the transaction was ready to close and that a few deeds of trust needed to be cleared. Klungtvedt was still reluctant, but he agreed to meet with Miller at the Adams Hotel in Phoenix later on that day.

At the meeting at the Adams Hotel, Klungtvedt and appellant were joined by Howard Woodall, who was introduced as appellant's partner. Appellant told Klungtvedt that he would be willing to secure the loan with a deed of trust to an eighty acre parcel of land located in Calaveras County, California. Appellant further told Klungtvedt that Disneyland was building a complex near the eighty acre parcel; that the parcel was improved with roads, water, sewage facilities, and utilities; that the land was valued at the sum of $2,000.00 per acre; and that the land was unencumbered.

On November 18, 1976, Klungtvedt loaned $50,000.00 to appellant in the form of a cashier's check made payable to appellant. In return, Klungtvedt was given a check postdated to December 1, 1976, drawn on appellant's trust account, a personal re-

**116**

ceipt from appellant, a promissory note signed by Woodall and appellant, and a warranty deed to the eighty acres of property in Calaveras County, California.

On December 1, 1976, Klungtvedt asked appellant whether he could deposit the check and appellant told him that he did not have the money yet. From December 1, 1976, through January 3, 1977, Klungtvedt repeatedly contacted appellant and appellant repeatedly told him that he did not have the money yet. Finally, Klungtvedt filed a civil action against appellant and Woodall, among others. That case proceeded to trial in the Maricopa County Superior Court. Twice during the civil proceedings appellant stated under oath that the loan obtained from Klungtvedt was for Howard Woodall only, and that Klungtvedt was clearly told that the loan was for Woodall. The perjury charges in the instant case arose from the two assertions in the civil proceedings made by appellant.

The evidence at trial further showed that after appellant and Woodall received the loan from Klungtvedt, they divided the proceeds of the loan between themselves. They did not use the proceeds of the loan to clear deeds of trust relating to the California transaction. Moreover, the evidence at trial showed that there was no proposed Disneyland development adjacent to the land purportedly deeded to Klungtvedt as security and, further, that the land was unimproved and of a value substantially less than that represented to Klungtvedt by appellant. Finally, because there were numerous tax liens on the Calaveras County land, the California Recorder's Office refused to record the deed conveying the land to Klungtvedt. The charge of grand theft by false pretenses arose out of the transactions between Klungtvedt, appellant, and Woodall.

### JEFFRIES TRANSACTION

Prior to trial in the instant case, appellant filed two motions *in limine* to exclude from the trial any and all references, testimony, and evidence involving a transaction between appellant, Woodall, and James Jeffries. This transaction was the subject of criminal charges in a related case, CR–99404, for which appellant was convicted following his conviction in the present case. The trial court denied both motions. During the trial in this case, Howard Woodall was allowed to testify to the events which formed the transaction between Jeffries, Woodall, and appellant. Appellant claims that the trial court erred in admitting Woodall's testimony and in allowing the State to argue the similarities between the Jeffries transaction and the Klungtvedt transaction during its opening statement and closing argument.

Woodall testified that appellant introduced Jeffries to Woodall in November 1976 in order to discuss a loan between Jeffries and Woodall. Woodall sought to borrow $50,000.00 from Jeffries ostensibly for the purpose of clearing deeds of trust in a Fricot City, California, land transaction. The land transaction was the same California land transaction which formed the basis of the Klungtvedt loan. Woodall told Jeffries he would repay him $65,000.00, which would be secured by a deed of trust to eighty acres of land located in Calaveras County, California. Woodall and appellant explained to Jeffries that the eighty acres were near a proposed Disneyland development, that the land was improved with utilities and roads, and that the land would be valued at $15,000.00 to $25,000.00 per acre after the Disneyland complex was built. Ultimately, on November 22, 1976, Jeffries gave Woodall a check for $50,000.00. In exchange, he received a warranty deed to the eighty acres in Calaveras County, which was recorded. At the time the loan occurred, appellant was in New Jersey attempting to close another real estate transaction with the Teamsters Union for the purpose of a warehouse for Woodall and appellant. Although Woodall and appellant had represented to Jeffries that they intended to use his money to clear the deeds of trust on the California land, they actually intended to use his money to close the New Jersey warehouse deal. The New Jersey warehouse transaction did not occur;

when Woodall cashed the check from Jeffries, however, he exchanged it for cashiers' checks in $2,500.00 denominations and gave $15,000.00 of it to appellant upon his return from New Jersey. The proceeds of the Jeffries loan were never used to clear deeds of trust in California.

■ Appellant argues on appeal that the trial court improperly admitted evidence of the Jeffries transaction because the transaction was highly dissimilar from the Klungtvedt loan. We disagree. While there were some differences between the Jeffries transaction and the Klungtvedt transaction,[1] the two transactions were substantially similar. In each case, the amount of the loan request was the same, $50,-000.00, and the bonus was the same, $15,-000.00. Each transaction was accomplished by means of meetings between the victim, Woodall, and Miller, where it was represented that the money was needed for clearing up deeds of trust on a potentially highly profitable transaction in California, and that the money was needed quickly. As to both transactions, the same misrepresentations were made as to the condition and value of the eighty acre parcel in Calaveras County, California. Each transaction was ostensibly secured by that parcel of land. Each transaction occurred during November 1976.

Arizona Rule of Evidence 404(b) states that:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

The State in this case argues that the evidence of the Jeffries transaction was admissible to establish intent and common scheme or plan. We agree. In order for evidence to be admissible under the common scheme exception, the "similarities be-

tween the offenses ... must be in those aspects where normally there could be expected to be found differences." *State v. Jackson*, 124 Ariz. 202, 204, 603 P.2d 94 (1979) (quoting *State v. Akins*, 94 Ariz. 263, 266, 383 P.2d 180, 182–83 (1963)). In ruling on the admissibility of prior bad acts, the trial court must consider the differences between the acts as well as the similarities. *Id.* Finally, before evidence of a separate crime or offense may be admitted, "there must be evidence of that other crime substantial enough to take that case to a jury . . . . although it need not be proof beyond a reasonable doubt." *State v. Marahrens*, 114 Ariz. 304, 307, 560 P.2d 1211 (1977). In the instant case, we find that the two offenses were sufficiently similar to justify admission of the Jeffries transaction to prove common scheme, plan, and intent. Moreover, we find that the proof of the Jeffries transaction as admitted into evidence was adequate to take that case to a jury. We conclude, therefore, that the trial court did not err in admitting the testimony of the Jeffries transaction.

### JUDGE CORDOVA'S TESTIMONY

■ Following the close of appellant's case and following appellant's testimony in his own behalf, the State called as a rebuttal witness Judge Valdemar Cordova, a superior court judge. Judge Cordova had presided in the civil suit filed by Klungtvedt against appellant Woodall, and others. Judge Cordova testified, on direct examination, as follows:

Q: Judge Cordova, did you preside over a civil trial on April 21, 1977, entitled: Klungtvedt vs. Miller, Woodall and Bahia Chetumal Corporation?

A: Yes, I did.

Q: Judge Cordova, was there a jury trial on April 21, or was that a civil matter tried to you as the Court?

A: It was tried to me.

Q: Did part of your duties include being the finder of fact in that case?

---

1. In the Jeffries transaction, appellant was not physically present when Jeffries gave the $50,-000.00 check to Woodall, and Jeffries also looked at other properties ostensibly owned by Woodall in Oklahoma for purposes of securing his loan.

A: That's true.

Q: As a finder of fact, did your duties include evaluating the truthfulness and credibility of the witnesses?

A: Yes it did.

Q: Do you have an opinion as to Mr. Miller's truthfulness?

A: Yes I do.

Q: What is that opinion sir?

. . . . .

A: Not very good.

Q: And, based on your opinion, would you believe Mr. Miller under oath?

A: I'm sorry, I would not.

Appellant asserts that this testimony was inadmissible because it was evidence of a specific instance of misconduct instead of merely a statement of reputation or an opinion concerning character for untruthfulness. In addition, appellant argues that the trial court abused its discretion in giving more weight to its probative value than to the prejudicial effect it would create.

Once having testified as to his character for truthfulness, appellant placed the matter in issue and opened it to rebuttal by the prosecution. Arizona Rule of Evidence 404(a)(1). The State was then entitled to prove by opinion or reputation a trait of character for untruthfulness. Rules 405(a), 608(a). Testimony concerning specific instances of conduct would not have been admissible except upon cross-examination of the reputation or opinion, rule 608(b), or where the character of the appellant was an essential element of the charge or defense. Rule 405(b).

We hold that the testimony of Judge Cordova, earlier quoted, did not amount to evidence of a specific instance of conduct in violation of rule 405(b) or rule 608(b). Judge Cordova's testimony related in a generalized way to the civil trial involving appellant over which he presided and was merely foundational. There was no attempt to elicit on direct examination by the State testimony concerning specific instances of untruth occurring at the trial.

■ Even if we were to hold Judge Cordova's testimony on direct examination did involve a specific instance of conduct, the testimony would be admissible under rule 405(b) because appellant, as an element of his defense, had placed in issue his trait of character for truthfulness.

■ Appellant argues, however, that the trial court abused its discretion by admitting this testimony because its prejudicial impact outweighed its probative value. He refers here, of course, to the fact that the witness was a superior court judge. This is a matter seriously to be weighed by the trial court. It is not every case where a trial judge should allow testimony of a judge to prove character or credibility. We think that the trial court in this case acted within its discretion to admit the testimony when the nature of the case and the matters at issue are considered. The trial extended over six weeks and numerous witnesses were called by the State. The evidence of appellant's guilt was very strong on all counts. The question of truthfulness was directly relevant to the perjury charges. We are unable to say that an abuse of discretion occurred when Judge Cordova was permitted to testify.

## TESTIMONY REGARDING JEROME STANLEY

■ During the trial, appellant called as a witness Jerome Stanley, a California attorney. Stanley had been the owner of the eighty acres in Calaveras County, California, which he had transferred to Woodall's corporation, Bahia Chetumal. Stanley was called primarily for the purpose of establishing the value of the land. He testified that in his opinion the eighty acres were worth from $750.00 to $1,000.00 per acre. Additionally, he testified as to his observation of the relationship between appellant and Woodall to the effect that appellant was Woodall's attorney, that Stanley's impression was that the appellant was a "gopher," and that in the transaction between himself and Woodall, he felt Woodall had defrauded him. Following Stanley's testimony, the State recalled Woodall as a re-

buttal witness and Woodall testified that he thought Stanley was "a crook and a swindler." Appellant's motion for a mistrial based on Woodall's statement was denied; the trial court noted, however, that the answer was error, though not prejudicial, and instructed the jury to disregard the statement.

Appellant asserts here that the trial court improperly denied the motion for mistrial. Appellant points out that immediately prior to the testimony, he had moved to exclude any specific act testimony by Woodall concerning Stanley, and the motion had been granted. The trial court had specifically ruled that Woodall was limited to giving his opinion without embellishment concerning Stanley's character for truthfulness or untruthfulness. He contends that Woodall's statement had been specifically excluded as improper rebuttal testimony and that the trial court had a duty to declare a mistrial.

We disagree. In reviewing the testimony, we note first the absence of any reference to specific acts of misconduct of Stanley upon which Woodall based his opinion. The trial court immediately instructed the jury to disregard the answer. In light of the length and complexity of the trial, and the substantial evidence of appellant's guilt, we believe that it is unlikely that Woodall's single statement, without more, prejudiced the jury. The granting or denial of a motion for mistrial is a matter which is left to the sound discretion of the trial court, and will not be reversed on appeal absent a showing that the trial court abused its discretion. We find no abuse of discretion in this case.

### JURY INSTRUCTIONS

■ Appellant next claims that the trial court erred in refusing two of his requested jury instructions. The first requested instruction related to the state of mind of a person charged with perjury and the second requested instruction dealt with the issue of evaluation of the testimony of an accomplice. We will discuss each instruction in the order presented.

Appellant's proposed instruction number ten was as follows:

If you find that, based upon the evidence presented, Mr. Miller in fact had probable cause to believe that the facts forming the basis of the perjury allegations are true, you must find Mr. Miller not guilty of perjury.

Appellant's defense to the perjury charges at trial was that the Klungtvedt loan was solely for the benefit of Woodall, that appellant acted only as an attorney for Woodall in obtaining the loan and as a guarantor on the loan, and that he therefore believed his statements in the civil proceedings that the loan was solely for the benefit of Woodall. Thus, he requested the instruction quoted above. The trial court instructed the jury on the elements of perjury as follows:

The crime of perjury has four elements. The defendant must:

One. Make or subscribe a material statement;

Two. Under oath, affirmation, or other legal binding assertion;

Three. In any trial, hearing, investigation, deposition, certification or declaration;

Four. When in fact the witness or declarant does not believe the statement is true, or knows that it is not true, or intends thereby to avoid or obstruct the ascertainment of the truth.

An unqualified statement of that which one does not know to be true is equivalent to a statement of that which one knows to be false. An essential element of perjury is that the statement to be made wilfully by a person who knows or believes that the statement is false, or is aware that he's ignorant of the truth or falsity of the statement.

A statement made under an honest mistake and in a belief that it is true is not perjury even though the statement be false.

The jury was instructed that when a person makes a statement under an honest mistake and in a belief that it is true, the person does not commit perjury even when

the statement is false. Thus, the jury was adequately instructed on the defendant's theory of the case.

■ Moreover, appellant's requested instruction is an incorrect statement of the law in Arizona at the time he was tried. A.R.S. § 13–561 provided that one was guilty of perjury when he made a statement under oath that he did not believe to be true or that he knew was not true. The standard for determining guilt of the offense of perjury was one of actual belief rather than probable cause to believe. While a criminal defendant is entitled to have the jury instructed on any theory of his case reasonably supported by the evidence, instructions need not be given if they are adequately covered by other instructions. *State v. Brooks*, 127 Ariz. 130, 618 P.2d 624 (Ct.App.1980). Appellant's theory of the case was thoroughly covered in the perjury instructions as given by the trial court and he was not entitled to an instruction which contained a misstatement of law.

■ Appellant also complains that the trial court erred in refusing his requested instruction number 17, which was as follows:

It is the law that the testimony of an accomplice ought to be viewed with distrust. This does not mean that you may arbitrarily disregard such testimony, but you should give to it the weight to which you find it to be entitled after examining it with care and caution and in light of all the evidence in the case.

The trial court instead gave the standard instructions concerning credibility of witnesses and the standard instruction dealing with the weight to be given to the testimony of a witness who has been convicted of a felony:

You must decide the accuracy of each witness's testimony. Take into account such things as his ability and opportunity to observe, his memory, his manner while testifying, any motive or prejudice he might have, and any inconsistent statements he might have made. Consider his testimony in light of all the evidence in the case.

If a witness has been convicted of a felony that conviction does not necessarily mean that you cannot believe his testimony. A witness's conviction of a felony is one of the circumstances you should consider in determining whether to believe that witness.

In our opinion, the trial court properly refused to give the requested instruction. Basically the requested instruction told the jury that they were to automatically distrust the testimony of Woodall. "Weighing the credibility of witnesses is the province of the jury, not the judge." *State v. Austin*, 124 Ariz. 231, 234, 603 P.2d 502 (1979). The jury was properly instructed of the elements they should consider in weighing the testimony of the various witnesses. We find no error.

## SUBPOENA DUCES TECUM

■ In March 1978 the State issued a subpoena duces tecum for the records of Henry P. Friedlander requesting production of all records, papers, and documents relating to appellant. Friedlander had been hired by appellant as a law clerk in 1977. Appellant claimed that at that time he was acting as an attorney on his own behalf and that he gave the items which were the subject of the subpoena to Friedlander with the intent and expectation that they would be used confidentially in the preparation of his case. He filed a motion to quash the subpoena on the ground that the subpoena items were protected by the attorney-client privilege. The motion was denied and apparently the items were released by Friedlander to the prosecution. Included in the items was appellant's appointment calendar for the years 1976 through 1977. He claims on appeal that his attorney-client privilege applies to and includes communications made to his law clerk and that the trial court improperly denied the motion to quash.

Appellant's theory seems to be that the attorney-client privilege extends to law clerks and that since appellant was acting as his own attorney, the privilege should be

extended to his law clerk at the time. We find, however, that it is impossible to evaluate the merits of appellant's claim based on the record presented to this court. We have thoroughly reviewed the motion to quash filed in the trial court, the response, and the reply. Nothing in the motion or reply sets forth what the relationship was between appellant and Friedlander. Nothing in the record establishes whether Friedlander was working on appellant's own case, and, if so, what the nature of the work was. The record plainly does not reveal what was received by the State as a result of the subpoena. It is impossible to evaluate whether there were incriminatory items among the items received by the State, or even whether there were items which led to the discovery of other incriminatory items prior to trial. Friedlander did not testify at the trial. It further does not appear that any of the items produced as a result of the subpoena were introduced into evidence against appellant.

Appellant's motion to quash failed to point out to the trial court, or to this court, any way in which he might be prejudiced by the court's denial of the motion. Finally, in reviewing the record independently for prejudice, we have been unable to find any indication that the trial court's action in refusing to quash the subpoena prejudiced appellant. Thus, even if appellant's claim might have had merit, he has failed to present it to this court.

For the foregoing reasons, the judgment of the trial court is affirmed.

CONTREAS and WREN, JJ., concur.